**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 25-1751**

─────────────

CURTIS M. WHATELEY,

> Plaintiff – Appellant,

v.

GERALD F. LACKEY, in his official capacity as Commissioner of the Virginia Department of Motor Vehicles,

> Defendant – Appellee.

─────────────

Appeal from the United States District Court for the Western District of Virginia, at Lynchburg. Norman K. Moon, Senior District Judge. (6:25-cv-00010-NKM-CKM)

─────────────

Argued: May 6, 2026                                    Decided: July 31, 2026

─────────────

Before AGEE and HARRIS, Circuit Judges, and KEENAN, Senior Circuit Judge.

─────────────

Vacated and remanded by published opinion. Judge Harris wrote the opinion, in which Judge Agee and Judge Keenan joined.

─────────────

**ARGUED:** Matthew William Callahan, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, Richmond, Virginia, for Appellant. Richard Trent Taylor, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF:** Eden B. Heilman, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, Richmond, Virginia, for Appellant. Jay Jones, Attorney General, Jason S. Miyares, Attorney General, Janet W. Baugh, Senior Assistant Attorney General, Kevin M. Gallagher, Solicitor General, Tillman J. Breckenridge, Solicitor General, Graham K. Bryant, Principal Deputy Solicitor General, Meredith L. Baker,

Deputy Solicitor General, Leah J. DeFazio, Assistant Solicitor General, OFFICE OF THE
ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

———————

2

PAMELA HARRIS, Circuit Judge:

In Virginia, drivers may personalize their license plates with their own chosen character combinations. Virginia allows them to do so for a fee, and subject to certain restrictions for vulgarity and the like. Curtis Whateley took advantage of this opportunity and applied for a personalized license plate with the characters "FTP&ATF" – by which he meant, "Fuck the Police & Alcohol, Tobacco, and Firearms." Virginia first issued the plate but then revoked it on the grounds that it was vulgar and could be understood to promote violence. Whateley sued, alleging that Virginia had violated the First Amendment by recalling his personalized plate because of its message. The district court dismissed Whateley's suit, holding that his license plate message was government speech not subject to ordinary First Amendment protections.

This appeal requires us to address a question that has divided district courts and state supreme courts in recent years: whether the character combinations on personalized license plates (or "vanity plates") are government speech or private speech. Does Virginia speak for itself through the character combinations on the personalized plates it issues – in which case, it is entitled to express the views of its choice? Or do Virginia's personalized plates convey the private speech of drivers like Whateley – in which case, government restrictions on that speech must pass muster under the First Amendment? We conclude that Virginia's personalized license plate messages are private speech subject to First Amendment protection. Accordingly, we vacate the district court's dismissal and remand for further proceedings.

3

## I.

### A.

The Commonwealth of Virginia requires motor vehicles in the state to display license plates that include "the registration number assigned to the motor vehicle" and its owner. Va. Code Ann. §§ 46.2-711(F), 46.2-712(A). By default, the Virginia Department of Motor Vehicles ("DMV") assigns a registration number to each car, and that number appears on the car's license plate as the random-seeming combination of letters and numbers with which we all are familiar.

Since the 1970s, however, Virginia has allowed its residents to request a "personalized license plate" – sometimes called a "vanity plate" – in place of the standard plate with an assigned registration number. *See* 1972 Va. Acts ch. 427; Va. Code Ann. § 46.2-726 (authorizing the DMV to "reserve license plates with certain registration numbers or letters or combinations thereof for issuance to persons requesting license plates so numbered and lettered"); *Personalized License Plate Guidelines and Restrictions*, Va. Dep't of Motor Vehicles, https://perma.cc/2CWD-75JD [*hereinafter* DMV Guidelines]. For a $10 annual fee, anyone registering a car in Virginia can request a "personalized character combination" for his license plate. *Create a Plate*, Va. Dep't of Motor Vehicles, https://perma.cc/L26E-MFES. Virginia invites registrants to "[c]reat[e] [their] personalized message" by using a combination of seven characters, including letters, numbers, and certain symbols. DMV Guidelines. The program is very popular: Over 930,000 Virginia vehicles display personalized license plates, representing about 11% of all Virginia vehicles, among the highest rates in the country.

4

A personalized license plate request may be refused on certain limited grounds. First, the requested character combination must be unique to that license plate and not already in use on another vehicle. *Id.* And second, the DMV states that it "will not approve" a requested character combination that may be seen by a reasonable viewer as "[p]rofane, obscene, or vulgar in nature," "[s]exually explicit or graphic," "[e]xcretory-related," "[u]sed to describe intimate body parts or genitals," "[u]sed to condone or encourage violence," or "[u]sed to describe illegal activities or illegal substances."[1] *Id.* The DMV "reserves the right to recall and cancel any personalized license plate that was issued if the agency subsequently determines or discovers that the personalized license plate was not in compliance with these guidelines when issued." *Id.* And whether personalized or not, all Virginia license plates remain the property of the DMV. Va. Code Ann. § 46.2-713.

In 2023, Plaintiff Curtis Whateley requested a personalized license plate from the Virginia DMV with the character combination "FTP&ATF."[2] The DMV issued a set of plates for the front and back of his car, and Whateley drove with them displayed for more than a year. In 2024, however, the DMV received a complaint that Whateley's license

---

[1] There is one variant on this restriction that applies only to a narrow subset of applicants:  Pursuant to statute, the DMV may not issue personalized license plates to a registered sex offender if the requested character combination could be understood as a reference to children.  Va. Code Ann. § 46.2-726.

[2] These facts derive from Whateley's pro se complaint, which we construe liberally and whose well-pleaded factual allegations we accept as true at this stage. *Matherly v. Andrews*, 859 F.3d 264, 274 (4th Cir. 2017).

plate message was "most offensive" because it stood for "Fuck the Police & Alcohol, Tobacco, and Firearms." J.A. 8. And that is indeed the message Whateley intended to convey via his license plates, expressing his "opinion on the current state of policing in this country, and the [Bureau] of Alcohol, Tobacco, Firearms and Explosives." J.A. 6. In response to the complaint, the DMV recalled Whateley's plates, explaining that their message could reasonably be viewed as profane, obscene, or vulgar and as condoning or encouraging violence, in violation of the DMV's Guidelines.[3]

B.

After appealing unsuccessfully through the DMV's internal administrative process, Whateley, appearing pro se, sued DMV Commissioner Gerald Lackey in his official capacity to challenge the recall of his "FTP&ATF" plates. As relevant to this appeal, Whateley argued that the message on his personalized plates was private speech expressing his political views, and that the Commissioner violated his First Amendment rights by rejecting that message based on its content and viewpoint.[4]

---

[3] For reasons that are not clear, the DMV later reissued Whateley his "FTP&ATF" plates. When we sought briefing from the parties as to whether this appeal had become moot when the plates were reissued, we learned that the "FTP&ATF" plates have since been recalled again, with the DMV Commissioner clarifying that the earlier reissuance was in error. We are satisfied, and both parties agree, that there remains a live dispute between the parties.

[4] Whateley also brought a facial challenge to Virginia's personalized license plate statute and the implementing Guidelines, calling them vague and overbroad, and a procedural due process challenge to the DMV's revocation of his license plates. Whateley has not appealed the district court's dismissal of those claims, and we do not address them further.

The district court granted the Commissioner's motion to dismiss for failure to state a claim. *Whateley v. Lackey*, 785 F. Supp. 3d 149 (W.D. Va. 2025). Centrally, the district court agreed with the Commissioner that Virginia's personalized license plates constitute government speech, exempt from ordinary First Amendment scrutiny. *Id.* at 153–59. The court relied primarily on the Supreme Court's decision in *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015), which held that Texas's specialty license plate designs, approved by the state and then made available to the public at large, convey government and not private speech. *See id.* at 203, 208–09. The district court acknowledged some differences between Texas's specialty plate designs and Virginia's personalized character combinations, and it recognized the "common sense" perception that vanity plates like Virginia's express the driver's private speech and not a government message. *Whateley*, 785 F. Supp. 3d at 157. But it concluded that "[o]n balance," *Walker* dictated a finding of government speech. *Id.* at 159.

Now represented by counsel, Whateley timely appealed the dismissal of his First Amendment claim.

## II.

We review the district court's dismissal of Whateley's First Amendment claim de novo. *Winnebago Tribe of Neb. v. U.S. Dep't of Army*, 175 F.4th 529, 535 (4th Cir. 2026).

Whateley's claim turns on the distinction between private and government speech. As the parties agree, if the personalized character combinations issued through Virginia's personalized license plate program are the requester's private speech, then Virginia must

7

abide by First Amendment limitations applicable to government forums for private speech in its regulation of Whateley's message. *Walker*, 576 U.S. at 214–15; *Shurtleff v. City of Boston*, 596 U.S. 243, 247 (2022). The district court never engaged in a First Amendment forum analysis because it concluded that the personalized plates are government speech – in which case, as the parties also agree, the standard First Amendment rules do not apply and Whateley cannot prevail on his claim. *Walker*, 576 U.S. at 215.

To decide this question, "we conduct a holistic inquiry designed to determine whether the government intend[ed] to speak for itself" when it approved Whateley's FTP&ATF plate, or whether its personalized license plate program operates to "regulate private expression." *Shurtleff*, 596 U.S. at 252. The distinction between government and private speech may be straightforward when the government speaks for itself – when, for instance, "an official gives a speech in a representative capacity or a governmental body issues a report." *Id.* at 262 (Alito, J., concurring in the judgment). But when the government purports to speak through third parties, as in this case, the inquiry is more complicated, and courts must carefully scrutinize whether the government is indeed "enlist[ing] private entities to convey its own message," *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009) (internal quotation marks omitted), or instead "affixing a government seal of approval" – or disapproval – to private, First Amendment-protected speech, *Matal v. Tam*, 582 U.S. 218, 235 (2017). That difference is critical: The government's ability to discriminate among messages and viewpoints when it speaks for itself is "essential" for government to function, but the government-speech doctrine is

8

"susceptible to dangerous misuse" if deployed to "silence or muffle" a private citizen's "expression of disfavored viewpoints." *Id.*

As the district court recognized, the Supreme Court's 2015 decision in *Walker* offers the most helpful starting point for our inquiry. *Walker* involved a Texas program that allowed drivers to select "specialty license plate" designs, rather than Texas's standard license plate design, for their cars. *Walker*, 576 U.S. at 204. Each specialty plate contained the word "Texas," a license plate registration number, and a special design – graphics and often a slogan – authorized or approved by the state. *Id.* Individuals and organizations could propose their own specialty plate designs and submit them for approval by a state board, and in *Walker*, the Sons of Confederate Veterans did just that, applying for a specialty plate that would include the words "SONS OF CONFEDERATE VETERANS" and two images of the Confederate battle flag. *Id.* at 206. The Texas board rejected the proposed design because many members of the public would find it offensive, and the Sons of Confederate Veterans sued, alleging a violation of their First Amendment free speech rights. *Id.*

The Supreme Court held that the specialty license plate designs in question were government speech, and that Texas was therefore entitled to determine their content. *Id.* at 207 ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says.") In so doing, the Court laid out three key "factors" to guide the inquiry into whether speech is private or the government's own: "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or

9

controlled the expression." *Walker*, 576 U.S. at 209; *Shurtleff*, 596 U.S. at 252 (citing *Walker*, 576 U.S. at 209–14).

Critically, however, the *Walker* Court confined its decision to Texas's specialty plate design program and expressly declined to address a separate Texas program, similar to the Virginia program here, that allowed for "vanity plates" with personalized registration numbers. *Walker*, 576 U.S. at 204. And since *Walker*, courts have divided on that case's application to personalized character combinations on vanity plates. A majority of state courts and federal district courts to address the question post-*Walker* have found that personalized character combinations like Whateley's are private speech, subject to standard First Amendment review,[5] while a sizable minority have found them to be government speech exempt from ordinary First Amendment protection.[6] No federal court of appeals has decided this issue since *Walker*.[7]

---

[5] *See Mitchell v. Md. Motor Vehicle Admin.*, 148 A.3d 319 (Md. 2016); *Mitchell v. Md. Motor Vehicle Admin.*, 126 A.3d 165 (Md. Ct. Spec. App. 2015), *aff'd*, 148 A.3d 319 (2016); *Gilliam v. Gerregano*, 2023 WL 3749982 (Tenn. Ct. App. June 1, 2023), *rev'd*, __ S.W.3d __, 2025 WL 617603 (Tenn. Feb. 26, 2025); *Overington v. Fisher*, 733 F. Supp. 3d 339 (D. Del. 2024); *Ogilvie v. Gordon*, 2020 WL 10963944 (N.D. Cal. July 8, 2020); *Carroll v. Craddock*, 494 F. Supp. 3d 158 (D.R.I. 2020); *Hart v. Thomas*, 422 F. Supp. 3d 1227 (E.D. Ky. 2019); *Kotler v. Webb*, 2019 WL 4635168 (C.D. Cal. Aug. 29, 2019).

[6] In addition to the district court decision in this case, *Whateley*, 785 F. Supp. 3d 149, see *Gilliam v. Gerregano*, __ S.W.3d __, 2025 WL 617603 (Tenn. Feb. 26, 2025); *Comm'r of Ind. Bureau of Motor Vehicles v. Vawter*, 45 N.E.3d 1200 (Ind. 2015); *M J Nichols Co. v. Thompson*, 2025 WL 3564628 (W.D. Wis. Dec. 12, 2025); and *Odquina v. City & Cnty. of Honolulu*, 2022 WL 16715714 (D. Haw. Nov. 4, 2022).

[7] In an unpublished memorandum decision, the Ninth Circuit assumed without deciding that Hawaii's vanity plates are private speech. *Odquina v. City & Cnty. of Honolulu*, 2023 WL 4234232, at *1 (9th Cir. June 28, 2023). And before *Walker*, the (Continued)

We agree with the majority view and hold that the character combinations on Virginia's personalized license plates extend beyond the bounds of the government-speech doctrine set out in *Walker* and instead constitute private speech subject to First Amendment protection.

A.

We begin with a threshold question that framed the district court's analysis and on which the parties disagree:  What, exactly, is the speech at issue here?  The district court, tracking the Commissioner's position, viewed Whateley's license plate – a "government decal," owned and issued by Virginia – as the relevant speech.  *Whateley*, 785 F. Supp. 3d at 155.  And that license plate, taken as a whole, communicated a distinctly governmental message:  "[T]his vehicle is registered with the state."  *Id.*  According to the district court, that is the relevant message conveyed by *all* Virginia license plates, and its "general meaning" is not affected by the "unique series of characters" chosen by a personalized plate applicant like Whateley.  *Id.* at 155.  "License plates are the government saying 'this car is registered,' vanity plate or not."  *Id.* at 156.

We disagree.  Like Whateley, we think the proper focus is on the personalized character combinations selected by Virginia's vanity-plate applicants.  It is the character combination portion of a state-owned license plate that Virginia has opened up for a

Second and Eighth Circuits found states' vanity plate programs to convey private speech, though they did not explicitly conduct a government-speech inquiry.  *See Byrne v. Rutledge*, 623 F.3d 46, 53 n.7 (2d Cir. 2010); *Roach v. Stouffer*, 560 F.3d 860, 864 (8th Cir. 2009) (citing *Lewis v. Wilson*, 253 F.3d 1077 (8th Cir. 2001)); *Perry v. McDonald*, 280 F.3d 159, 167 (2d Cir. 2001).

11

"personalized message," *see* DMV Guidelines, and through which Whateley sought to "express [his] own views," *Shurtleff*, 596 U.S. at 248. The expressive nature of Whateley's personalized character combination is clear – hence the complaint to the DMV characterizing it as "most offensive," J.A. 8 – and so the relevant message for purposes of this case is the one conveyed by the characters "FTP&ATF."

Neither the Commissioner nor the district court has cited any authority in which a court identified the message at issue in a First Amendment case as a generic functional message – "this vehicle is registered with the state" – that is unaffected by the specific words, images, or other forms of speech used by the speaker. To the contrary, when the *Walker* Court described the "messages" that Texas's specialty license plates convey, it considered "graphic[s]" like state symbols and "slogan[s]" that "urge action, [] promote tourism, and [] tout local industries." *Walker*, 576 U.S. at 211. It described the "various messages" that Texas communicated "through its license plate designs" – namely, the specific words and slogans proposed by private organizations like the Sons of Confederate Veterans. *Id.* The Court identified those logos and slogans as the relevant "messages," distinguishing that expressive material from the "state names and vehicle identification numbers" that serve a more functional purpose. *Id.* at 210–11; *see also Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (describing the "Live Free or Die" slogan on New Hampshire license plates as "the State's ideological message").

In other cases, too, the Supreme Court has focused on the words and images contributed by third parties in deciding whether they are speaking for themselves or on behalf of the government. In *Matal v. Tam*, for instance, the Court held that distinctive

12

trademarks proposed by applicants and approved and registered by the federal government are private, not government, speech. 582 U.S. at 239. In so doing, it did not construe the message of a trademark to be purely functional, as in "this trademark is registered with the federal government." Instead, it described the "message" at issue as the specific "content of a registered mark," as proposed by the third-party applicant, such as "'make.believe' (Sony), 'Think different' (Apple), 'Just do it' (Nike), or 'Have it your way' (Burger King)." *Id.* at 236. And in *Summum*, the Court held that privately donated monuments in a public park constitute government speech, 555 U.S. at 470 – after explaining that the "messages" conveyed by the monuments went beyond function to include specific "text-based" communications like the word "Imagine" on a mosaic in Central Park or the word "peace" displayed on a monument in Arkansas. *Id.* at 474–75.

The Supreme Court's public forum cases confirm that our focus is properly on Whateley's personalized character combination, not the primary function of license plates in general. The public forum doctrine recognizes that the government may open its property as a forum for private speech, and that when it does, it must adhere to First Amendment limits in restricting access. *See id.* at 469–70. And as the Supreme Court has made clear, in analyzing whether private parties have free speech rights on government property, what matters is *not* the nature or function of the government property as a whole. Instead, the relevant forum is "the particular channel of communication" sought by the speaker, meaning the specific form of "access sought by the speaker" to the government's property. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985) (defining forum as charitable giving program within federal workplace, not workplace as

13

a whole); *see Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983) (forum defined as school mail system, not school as whole); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 391 (1993) (forum defined as after-hours use of school property, not school property as a whole).

Here, the only "channel of communication" sought by Whateley – the specific form of "access" he seeks to a government-owned license plate – is the personalized character combination offered him by Virginia's vanity-plate program. And within that channel, Whateley seeks to communicate a specific personalized message: FTP&ATF. That is the message Whateley intends to convey, and it is the message received by observers like the anonymous DMV complainant. And in every context but this litigation, the DMV, too, understands the message communicated by Virginia's personalized license plates to be the unique personalized character combinations on those plates. As the DMV explains, it applies its guidelines for approval of personalized plates by asking how an observer "would interpret *the message conveyed by the character combination*" requested. *Personalized Message Information*, Va. Dep't of Motor Vehicles, https://perma.cc/K9GL-CE5F [*hereinafter* DMV Personalized Message Information] (emphasis added). If, as the Commissioner here argues, the "message conveyed" by every Virginia license plate, regardless of its character combination, were "this vehicle is registered with the state," then there would be no need for guidelines – and no need to recall an "FTP&ATF" plate because it communicated a vulgarity or encouraged violence.

In short, Virginia's personalized plates "convey a 'personalized message with intrinsic meaning (sometimes clear, sometimes abstruse) that is independent of mere

14

identification and specific to the owner.'" *Hart v. Thomas*, 422 F. Supp. 3d 1227, 1232 (E.D. Ky. 2019) (quoting *Mitchell v. Md. Motor Vehicle Admin.*, 148 A.3d 319, 326 (Md. 2016)). Here, that message is "FTP&ATF." Our task is to discern, using guidance the Supreme Court has provided, whether that message is private or government speech.

B.

To conduct that inquiry, we return to *Walker* and its three key factors for determining whether the government is itself speaking or instead regulating the speech of private parties. The first factor, recall, asks about the "history of the expression at issue" and whether "governments have long used [it] to speak to the public." *Shurtleff*, 596 U.S. at 252; *Walker*, 576 U.S. at 209 (cleaned up). The second factor assesses "the public's likely perception as to who (the government or a private person) is speaking." *Shurtleff*, 596 U.S. at 252; *see Walker*, 576 U.S. at 210. And the third examines "the extent to which the government has actively shaped or controlled the expression" in question. *Shurtleff*, 596 U.S. at 252; *see Walker*, 576 U.S. at 210.

We assess each in turn, looking to the complaint and judicially noticeable materials. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). We recognize that our review is not to be "mechanical," and must instead be sensitive to "a case's context." *Shurtleff*, 596 U.S. at 252. And because the factual "context" in *Walker* – Texas's specialty license plate designs – has some obvious similarities to the one we consider now, we are especially attentive to the Court's analysis in that case. At the same time, however, we heed the Court's caution that *Walker*'s finding of government speech "likely marks the outer bounds of the government-speech doctrine." *Matal*, 582 U.S. at

15

238. Because Virginia's personalized license plate messages have greater indicia of private speech than Texas's specialty plate designs, and because they look more like the types of speech the Supreme Court has identified as private, we conclude that the messages here are private speech protected by the First Amendment.

1.

In assessing the first factor, "the history of the expression at issue," the Court instructs us to examine both the "general history" of the form of expression at issue, as well as the "details" of the "program" in which the plaintiff seeks to participate. *Shurtleff*, 596 U.S. at 252–54 (looking to both the "general history" of "flag flying, particularly at the seat of government," as well as the "details of *this* flag-flying program"); *accord Walker*, 576 U.S. at 210–12; *Summum*, 555 U.S. at 470–73. As explained above, the "expression at issue" in this case is the particular "alphanumeric combinations" on Virginia's vanity plates. *Ogilvie v. Gordon*, 2020 WL 10963944, at *3 (N.D. Cal. July 8, 2020).

On general history, we see little evidence that state governments have traditionally used the character combinations on license plates to communicate their own messages. *See Whateley*, 785 F. Supp. 3d at 155 (district court acknowledging that the Commissioner "has not introduced much in the way of historical [evidence]"). To the contrary, the *Walker* Court itself distinguished license plate design elements, like logos and slogans, that communicate "messages from the States," from "vehicle identification numbers," which do not. *Walker*, 576 U.S. at 210–11.

The Commissioner, again focusing on the function served by license plates in general, argues that states' randomly assigned registration numbers do convey a "message"

16

because they may be matched with information in a database to identify a vehicle. But however they may be used, vehicle registration numbers do not themselves express ideas or communicate in a language that can be understood by observers, and they carry "no intrinsic meaning." *Mitchell v. Md. Motor Vehicle Admin.*, 126 A.3d 165, 184 (Md. Ct. Spec. App. 2015), *aff'd*, 148 A.3d 319 (Md. 2016). The Commissioner fails to explain how these collections of characters convey "messages from the States" in a manner comparable to the logos and slogans analyzed in *Walker*. *See Walker*, 576 U.S. at 211; *Hart*, 422 F. Supp. 3d at 1232 ("[T]he Court disagrees that license plate *numbers*, separate and distinct from license plate *designs*, have historically been used to communicate messages from the State.").[8]

As for the particular history of Virginia's personalized license plate program, it, too, appears to be devoid of government messaging. The Commissioner cannot point to a single instance in which Virginia communicated an expressive *message* – as distinct from a random and intrinsically meaningless set of characters – through its license plate registration numbers. Meanwhile, since the 1970s, many Virginians – and nearly a million

---

[8] Virginia's assigned registration numbers are in this way distinct from the computer code at issue in the cases on which the Commissioner relies, finding that computer code may count as an expressive message. Response Brief at 15–16 (citing *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446–47 (2d Cir. 2001); *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1434–35 (N.D. Cal. 1996)). Those cases find computer code to qualify as speech precisely because it still "communicat[es] ideas," and does so in a "language" understood by programmers. *Corley*, 273 F.3d at 445, 448; *accord Bernstein*, 922 F. Supp. at 1434–35. And although "conduct," as distinct from linguistic or visual "speech," can qualify for First Amendment protection, it may do so only when it is intended and understood to communicate some "particularized message" or "idea." *Spence v. Washington*, 418 U.S. 405, 410–11 (1974). Generic, non-personalized vehicle registration numbers do none of those things.

today – have paid a fee to place what Virginia advertises as their own "personalized message[s]" onto their license plates. DMV Personalized Message Information. And the DMV itself recognizes that those personalized character combinations convey messages that can be "interpret[ed]" by observers to carry either acceptable or offensive meanings. *Id.*

In short, throughout the relevant history, Virginia has placed only characters with no intrinsic meaning on its license plates in the portion reserved for registration numbers. Individual drivers are the ones – and the only ones – who have swapped out those random characters for expressive messages conveyed by way of personalized character combinations. That history is notably different from that of Texas's specialty license plates in *Walker*, where the Court found a long history, both general and particular, of state communication by way of expressive license plate designs. *See Walker*, 576 U.S. at 211–12; *Mitchell*, 148 A.3d at 326 ("So, historically, vehicle owners have used vanity plates to communicate their own personal messages and the State has not used vanity plates to communicate any message at all.").

2.

The second factor, too, points in the direction of private speech. Here we consider "the public's likely perception as to who (the government or a private person) is speaking" via Virginia's personalized license plates. *Shurtleff*, 596 U.S. at 252. The district court called it a "paradox" that "highly personalized license plates" like Whateley's could be understood to "speak for the state rather than the driver," and it recognized that "the public knows that the driver customized the message on the license plate." *Whateley*, 785 F. Supp.

18

3d at 157–58.  Nonetheless, the district court felt bound by *Walker* to conclude that the public likely perceives Virginia's personalized license plates as government speech, both because *Walker* had rejected a similar "appeal to common sense" and because the license plates in *Walker* share certain characteristics with Virginia's personalized plates.  *Id.* at 156–57.  For example, both plates are issued by the state, are required by state law to be displayed on the front and back of vehicles, and prominently feature the issuing state's name.  *Id.*

In our view, however, the two cases are materially distinct.  First, as both parties agree, the public perception factor overlaps to some degree with the history factor:  The public is more likely to perceive a given mode of expression as government speech if it historically has been used by the government to speak.  *See, e.g.*, *Shurtleff*, 596 U.S. at 255 (assessing likely public perception of flags at Boston's City Hall based in part how those flags historically have been used); *Summum*, 555 U.S. at 470–71 (same with respect to privately donated monuments in public parks).  And as we have explained, the relevant history here – unlike in *Walker* – is one of private and not government speech.  Virginians are more likely to view a personalized plate as the driver's own speech because they have never encountered a message from the government in the characters that make up a license plate's registration number – whereas they *have* encountered, perhaps hundreds or thousands of times, what appear to be drivers' own messages in those registration numbers.

That leads to a second key difference between this case and *Walker*: the sheer number of messages at issue.  In *Walker*, Texas had in circulation about 350 specialty plate designs.  *Walker*, 576 U.S. at 221 (Alito, J., dissenting).  By contrast, it appears that more

19

than 930,000 cars registered in Virginia display personalized license plates, each one unique.[9]  Common sense tells us the public is unlikely to perceive the government as the source of each of those hundreds of thousands of distinct messages.  That is in part, of course, because such messages often have nothing to do with government policies or functions, *see Whateley*, 785 F. Supp. 3d at 157 (acknowledging that vanity plate messages often "bear[] no understandable connection to governmental policy"), and may be idiosyncratic or even unseemly, *see Hart*, 422 F. Supp. 3d at 1233 (listing messages on Kentucky vanity plates including "BOOGR" and "FATA55").  But the volume of messages itself is also important, as *Matal* recognized in holding that the two million-plus trademarks approved and registered by the federal government are private rather than government speech:  "If the federal registration of a trademark makes the mark government speech, the Federal Government is babbling prodigiously and incoherently" and "expressing contradictory views."  582 U.S. at 225, 236.  So too here, where on the Commissioner's theory, the government is simultaneously communicating the hundreds of thousands of disparate messages that appear on drivers' vanity plates at any given time.

---

[9] The parties both rely on a recent news article providing this number.  *See* Michele Kettner, *Can You Decipher These Virginia Vanity License Plates?*, N. Va. Mag. (Apr. 2, 2025), https://perma.cc/MP3B-RANE.  Though not itself an official source, that article echoes a 2009 report from the DMV providing a similar but slightly higher number of 1,044,354 personalized license plates in Virginia. *See* Va. Dep't of Motor Vehicles, Active Vehicle Registration Report as of June 30, 2009, https://perma.cc/PX3W-WZZH. *United States v. Doe*, 962 F.3d 139, 147 & n.6 (4th Cir. 2020) ("We may take judicial notice of governmental reports.")

Third, Virginia's personalized plate messages are less likely to be viewed as government speech than Texas's specialty plate designs because the Virginia messages are just that – *personalized*. Each of the character combinations on Virginia's vanity plates must be "unique," used by one and only one driver. DMV Guidelines*; see Mitchell*, 148 A.3d at 326 ("[T]he personal nature of a vanity plate message makes it unlikely that members of the public, upon seeing the vanity plate, will think the message comes from the State." (internal quotation marks omitted)). By contrast, the Texas specialty plate designs at issue in *Walker*, once approved by the state, were made widely available to the general public and could be displayed by as many drivers as were interested. *Walker*, 576 U.S. at 204–05; *see* Tex. Transp. Code Ann. § 504.008. Indeed, Texas displayed the approved specialty plate designs on its own DMV website for selection by drivers, publicly affiliating itself with the privately submitted designs. *Walker*, 576 U.S. at 236 (Alito, J., dissenting). The Commissioner points to no similar actions by Virginia's DMV to associate itself with the personalized character combinations selected by individual drivers like Whateley. And that gives us further confidence that the public likely and reasonably perceives Virginia's unique personalized license plates as speaking for the driver and not the government.

The Commissioner offers two counterarguments, neither convincing. First, the Commissioner insists that the public reasonably attributes Virginia personalized license plate messages to the government because the license plates are government property. *See* Va. Code Ann. § 46.2-713. But private speech happens all the time on government property. "Indeed, the Supreme Court's public forum doctrine," noted above, "exists only

21

because of the need to analyze government restrictions of private speech that takes place on government property." *Mitchell*, 148 A.3d at 327. The question in this case is whether Virginia, in recalling Whateley's personalized plate, is "simply managing government property" that it has opened in part to private speech – in which case, it must do so consistent with the First Amendment – or whether it "is engaging in expressive conduct" on its own behalf. *Walker*, 576 U.S. at 216. That government property is involved is a given, and it does nothing to answer our question.

Second, echoing the district court, the Commissioner contends that *Walker* forecloses reliance on the common-sense insight that the public would be most unlikely to believe that Virginia's vanity plates – often quirky, unseemly, or bizarre – carry an official government message. That is so, the Commissioner says, because the *Walker* dissent made a similar point, arguing that reasonable observers could not understand Texas to be speaking for itself through every slogan on its specialty plates, and the majority was not persuaded. *See Walker*, 576 U.S. at 221–22 (Alito, J., dissenting) ("If a car with a plate that says 'Rather Be Golfing' passed by at 8:30 am on a Monday morning, would you think: 'This is the official policy of the State – better to golf than to work?'"). But that view overreads *Walker* and fails to account for the Supreme Court's later decision in *Matal*.

As for *Walker*, the majority opinion did not address the view from "common sense" taken by the dissent. Instead, it relied on different facts specific to the context before it to draw a different conclusion: that "Texas's license plate designs convey government agreement with the message displayed." *Id.* at 212–13. But as we have explained already, the relevant facts about Virginia's personalized plate messages, including their history,

22

sheer number, and uniqueness, all differentiate this case from *Walker*. So it is not surprising that two years after it decided *Walker*, the Supreme Court in *Matal* – the case involving trademarks designed by private applicants and approved and registered by the federal government – put significant weight on the common-sense view that the government cannot be understood to have uttered every "unseemly" and "contradictory" message in over two million federal trademarks. *Matal*, 582 U.S. at 236. This is a *Matal* case, not a *Walker* case.

At bottom, the Commissioner's arguments on the public perception factor boil down to the claim that the public "inextricably associates" speech on property the government owns and controls with the government. But the public is more discerning than that. As the Supreme Court has made clear, when the government makes some portion of its property generally available to third-party speakers, the public sensibly understands the government to be permitting private speech, not to be speaking for itself. *See, e.g., Lamb's Chapel*, 508 U.S. at 395; *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834–35, 841–42 (1995). In other words, when faced with one of hundreds of thousands of Virginia vanity plates, with their unique and often idiosyncratic messages, a member of the public is not likely to think "the DMV is saying that," but instead, at most, "'the [DMV] let you get away with that?'" *Mitchell*, 148 A.3d at 327. That is a marker of private speech *permitted* by the government, not of the government's own speech.

### 3.

We turn finally to the third factor in the government-speech analysis: "the extent to which the government has actively shaped or controlled the expression" at issue. *Shurtleff*,

23

596 U.S. at 252.  This factor can be the "most salient feature" of the analysis, *id.* at 256, but it also can generate confusion.  The question, again, is whether the government, having invited people to participate in a program like Virginia's personalized license plate program, "intends to speak for itself" through the program's messages "or to regulate private expression."  *Id.* at 252.  And what makes it complicated is that government "control" of the expression at issue is a hallmark of both government speech *and* government regulation of private speech.  *Id.* at 264 (Alito, J., concurring in the judgment) ("[C]ontrol is also an essential element of censorship.").  So, the exercise of some degree of control or approval authority, by itself, cannot transform private speech into government speech, or distinguish the two.  *Id.*; *see Ogilvie*, 2020 WL 10963944, at *4.  Instead, we ask whether the government is exercising the "*type* of control" that would indicate the government intends to speak for itself, *Shurtleff*, 596 U.S. at 256 (emphasis added) – whether "the government has actively shaped or controlled the expression," maintaining "direct control" over the message, *id.* at 252 (internal quotation marks omitted).

The Commissioner argues, and the district court agreed, that Virginia sufficiently controls the messages conveyed on its vanity plates through the promulgation and enforcement of its guidelines on acceptable character combinations.  Those guidelines, recall, prohibit character combinations that might reasonably be seen as (broadly speaking) profane, obscene, vulgar, or sexually explicit; or encouraging or condoning violence; or describing illegal activities or substances.  DMV Guidelines.  Under those Guidelines, the district court reasoned, Virginia "exercises ultimate editorial control over the messages

24

displayed on vanity plates" that is indicative of government speech. *Whateley*, 785 F. Supp. 3d at 158.[10] We see it differently.

Again, we start with *Walker*. And in *Walker*, Texas "actively controlled" its specialty plate designs and "shaped [their] messages," *Shurtleff*, 596 U.S. at 256, to a significantly greater degree than Virginia controls and shapes its vanity plates. In *Walker*, for one thing, both the state legislature and the Department of Motor Vehicles could create specialty designs on their own initiative and of their own choosing, without any input from private parties. 576 U.S. at 205. And when third-party nonprofits did propose specialty designs, the DMV's consideration of those designs was notably hands-on and rigorous, involving calls for public comments and hearings before designs were approved – at which point, again, the approved designs were made generally available to the public and displayed on the DMV's website. *Id.* at 204–06; *see also id.* at 236 (Alito, J., dissenting). That level of state control and involvement is closer to paradigmatic government speech cases like *Johanns v. Livestock Marketing Association*, 544 U.S. 550 (2005) – in which Congress established the "overarching message" of a promotional campaign for beef and the federal government helped to develop and edit "every word," *id.* at 560–61 – than it is to Virginia's guidelines for vanity plates.

---

[10] The Commissioner also points to the statutory provision establishing the personalized license plates program, which allows him "in his discretion" to approve such plates, Va. Code Ann. § 46.2-726, and suggests he retains discretion to reject requested character combinations for reasons not listed in the DMV Guidelines. But the record does not show, and the Commissioner does not claim, that the Commissioner ever has used the hypothesized *ad hoc* discretion to go beyond the Guidelines' restrictions. *Cf. Shurtleff*, 596 U.S. at 256–57 (finding unused authority to ban messages insufficient to show active control indicative of government speech).

25

There is no doubt that Virginia has final approval authority over the messages Virginia's drivers wish to convey on their vanity plates, and that it may deny approval for messages it believes to be vulgar or offensive. But the exercise of that authority, on its own, is more consistent with the regulation of *private* expression in a public forum than it is with the government speaking on its own behalf. Indeed, that was exactly the issue the Supreme Court confronted in *Matal*. In that case, the government rejected a requested trademark that used a derogatory term for persons of Asian descent, invoking the Lanham Act's disparagement clause, which prohibits registration of trademarks that may "disparage" or "bring . . . into . . . disrepute" any "persons." 582 U.S. at 223 (quoting 15 U.S.C. § 1052(a)). In *Matal*, as here, the government did not create the underlying messages at issue (trademarks in *Matal*; personalized character combinations here), or set out an affirmative vision for the messages, or edit the messages once submitted. 582 U.S. at 235–36. But the federal government did – again, as Virginia does here – exercise a form of final control through a discrete set of negative prohibitions on certain offensive content. *See id.*; DMV Guidelines (listing six categories of prohibited messages). And that form of control, the Supreme Court concluded, was distinguishable from the state control exercised in *Walker*, and not enough to tilt in favor of treating trademarks as government speech. *Matal*, 582 U.S. at 235–36, 238.

We take the same approach here. Virginia restricts certain categories of messages deemed offensive or inappropriate, but it does not thereby "choose how to present itself" on its vanity plates, or "convey" an affirmative message of its own on all 930,000-plus personalized plates it has approved. *Walker*, 576 U.S. at 213; *Shurtleff*, 596 U.S. at 245.

26

Other federal courts of appeals have applied the same reasoning in similar contexts. *See Krasno v. Mnookin*, 148 F.4th 465, 480–81 (7th Cir. 2025) (finding insufficient control from negative prohibitions that "only suppress comments that happen to contain certain phrases or words" but do not limit displays to "only comments that convey [government]-approved messages"); *Cajune v. Indep. Sch. Dist. 194*, 105 F.4th 1070, 1081 (8th Cir. 2024) ("Without more, the mere existence of a review process with approval authority is insufficient by itself to transform private speech into government speech."). Because Virginia does not actively shape or control its personalized license plate messages within the meaning of cases like *Walker* and *Matal*, this third factor, too, weighs in favor of private speech.

* * * *

In sum, *Walker*'s three key factors all point toward private speech in this case. And considering the full context, we see no other indication that Virginia "intends to speak for itself" through the hundreds of thousands of messages chosen by drivers who participate in its personalized license plate program. *Shurtleff*, 596 U.S. at 252. Accordingly, we conclude that the personalized character combinations on Virginia's vanity plates are private speech, not government speech. It follows, as we explained at the outset, that Virginia's regulation of those messages and its recall of Whateley's "FTP&ATF" plates are subject to First Amendment scrutiny.

That is as far as we go today. Whateley's private speech is entitled to First Amendment protection under the public forum doctrine, but whether he will prevail under that doctrine is a different question. That analysis will turn on the nature of the forum

27

Virginia has provided for private speech on its personalized license plates and on Virginia's reasons for recalling Whateley's "FTP&ATF" message.[11]  The forum analysis can be complicated and fact-intensive.  *Compare Mitchell*, 148 A.3d at 328–39 (holding that Maryland vanity plates are private speech subject to First Amendment scrutiny, but that denial of the plaintiff's requested "MIERDA" message was permissible as a reasonable and viewpoint-neutral restriction in a nonpublic forum), *with Hart*, 422 F. Supp. 3d at 1233–34 (holding that Kentucky vanity plate messages are private speech, and that denial of the plaintiff's "IM GOD" vanity plate violated First Amendment limits applicable to nonpublic fora because it was unreasonable and viewpoint-based).  Because "we are a court of review, not first view," *United States v. Avila*, 134 F.4th 244, 248 (4th Cir. 2025), we follow our usual practice and leave this issue to the district court on remand.

### III.

For the foregoing reasons, we vacate the district court's order dismissing Whateley's First Amendment challenge to the recall of his personalized license plates on government-speech grounds, and we remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

---

[11] Oversimplifying somewhat, in traditional and designated public forums, open to all speakers on all topics, "governments have limited leeway to restrict speech," *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 196 (4th Cir. 2022), and restrictions generally are subject to strict scrutiny, *see Perry*, 460 U.S. at 45–46.  In a nonpublic forum, by contrast, speech restrictions "only need to be reasonable and viewpoint-neutral." *White Coat Waste*, 35 F.4th at 196.